**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

NETCHOICE,

*Plaintiff*,

v.

LETITIA JAMES, in her official capacity as New York Attorney General,

*Defendant*.

Civil Action No. 26-cv-9983

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. Every day, millions of New Yorkers access social media to read the news, check in on friends, watch a lecture, attend a religious service, debate politics, learn something new, or share a photograph. All of this expression is fully protected by the First Amendment. Yet New York Senate Bill 4505, as amended by Senate Bill 8827 (collectively, the "Act"), will force a vaguely defined and content-based collection of these services to repeatedly provide a state-authored "warning" about the constitutionally protected speech they publish to every user (unless the service has reasonably determined that the user is over 17 years old) both before users can access that speech and repeatedly while users engage with it. *See* Ex. A (text of Act). Unlike a warning on a cigarette package or product label, these subsequent warnings block access to the underlying speech. Users must wait through the State's message before they can return to the expression they seek. Accordingly, the Act violates bedrock constitutional protections under the First and Fourteenth Amendments.

2. Specifically, the Act requires covered websites to convey the State's truncated interpretation of the U.S. Surgeon General's Advisory about social media use: "The Surgeon General has warned that while social media may have benefits for some young users, excessive use may

be associated with significant mental health harms." N.Y. Gen. Bus. Law § 1521.[1] The Act requires that the warning be published each day the user accesses the service, and repeatedly throughout the day. § 1522. The Act further dictates when and for how long covered websites must communicate the State's preferred message, and how prominent that communication must be—requiring the communication to cover as much as "at least seventy-five percent" of the screen and remain for as long as 30 seconds. § 1522. And no matter how many times a user has seen the State's message, the Act precludes them from clicking through or bypassing it. The one "fixed star in our constitutional constellation" is that the First Amendment prohibits the government from compelling private actors to speak the State's preferred message. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The Act does exactly that. Colorado's materially similar compelled-speech warning requirement has already been enjoined. *NetChoice v. Weiser*, 808 F. Supp. 3d 1223 (D. Colo. 2025) (requiring warning label for minor users), *appeal docketed*, No. 25-01456 (10th Cir. Dec. 9, 2025). The Court should enjoin the enforcement of this law too.

3. "In this Nation, no official . . . may command our tongues or silence our voices." *Chiles v. Salazar*, 607 U.S. 627, 640 (2026) (citation omitted); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (the First Amendment's protections "include[] both the right to speak freely and the right to refrain from speaking at all"). And these First Amendment principles "do[] not go on leave when social media are involved." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024); *see, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024) ("*Bonta I*") (upholding preliminary injunction of compelled-speech requirement for websites); *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024) (similar).

[1] Unless otherwise noted, statutory citations in this Complaint refer to the New York General Business Law.

4. The Act violates these principles many times over. New York has myriad ways to speak to and persuade its residents. But the Act instead compels regulated services to speak the State's message.

5. And it compels users to listen: Users cannot "bypass or click through the warning," § 1522, no matter how many times the user has seen the message or how irrelevant the warning is to that user and that service. Unlike a static warning on a product label, these warnings repeatedly interrupt users and block access to protected speech. The Act is designed to block, burden, and browbeat "social media" users, even as they seek to "engage in a wide array of . . . activity on topics 'as diverse as human thought.'" *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017) (citation omitted).

6. The Supreme Court and lower courts across the Nation have recognized the constitutional problems of laws interfering with access to, and the dissemination of, the fully protected speech on these websites. *See Moody*, 603 U.S. at 744; *Packingham*, 582 U.S. at 107; *NetChoice v. Hilgers*, 840 F. Supp. 3d 777 (D. Neb. 2026); *NetChoice v. Griffin*, 831 F. Supp. 3d 816 (W.D. Ark. 2026); *NetChoice v. Jones*, 822 F. Supp. 3d 656 (E.D. Va. 2026); *NetChoice v. Murrill*, 812 F. Supp. 3d 594 (M.D. La. 2025); *NetChoice v. Griffin*, 812 F. Supp. 3d 905 (W.D. Ark. 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ("*Griffin II*"); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

7. The Act would force a content-based, speaker-based, and vaguely defined collection of "social media platforms" to publish a repeated warning notification to covered users that the services don't want to convey and that users are given no choice but to hear.

8. Compounding these problems, the Act's mandates are unconstitutionally vague. The Act's core "covered operator" coverage definition relies on vague terms that leave websites

uncertain about whether they must speak the Act's preferred message. § 1520. And for those websites that *are* forced to speak, the Act does not clearly explain what counterspeech the websites may engage in, because the Act also prohibits any speech that would "obscur[e]" the "visibility or prominence" of the warning label or intentionally "inhibit or subvert" the Act's purpose. § 1522(3).

9. To the extent the Act does prohibit counterspeech, the Act imposes a content-based and viewpoint-based restriction on speech that fails strict scrutiny.

10. This Court should enjoin Defendant from enforcing the Act against Plaintiff NetChoice's covered members and declare the Act unlawful.

**PARTIES & STANDING**

11. Plaintiff NetChoice is a District of Columbia nonprofit trade association for internet companies. NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the internet, while minimizing burdens that could prevent businesses from making the internet more accessible and useful. NetChoice's members are listed at NetChoice, About Us, https://perma.cc/R2DS-3YSA.

12. NetChoice has associational standing to challenge the Act because: (1) some of NetChoice's members have individual standing to sue in their own right; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge to the Act's compelled-speech requirements. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Defending Educ. v. Croton-Harmon Union Free Sch. Dist.*, 190 F.4th 53, 61 (2d Cir. 2026); *see also NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025).

13. Based on the Act's central coverage provisions, § 1520(2)-(3), (6), the Act regulates, at a minimum, services offered by the following NetChoice members: (1) Automattic (Tumblr); (2) Meta (Facebook, Instagram, and Threads); (3) Pinterest; (4) Reddit; (5) SpaceXSI (X);

(6) TikTok Inc. and TikTok USDS Joint Venture LLC (TikTok); and (7) YouTube. This Complaint refers to members with services that the Act regulates as "covered members."

14. Defendant Letitia James is the New York Attorney General. She is a New York resident and is sued in her official capacity. Defendant James has authority to both enforce the Act and "promulgate such rules and regulations as are necessary to effectuate and enforce the provisions" of the Act. §§ 1524, 1526.

## JURISDICTION & VENUE

15. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

16. Federal courts have the equitable power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

17. This Court has personal jurisdiction over Defendant because she resides in and conducts a substantial proportion of her official business in New York.

18. Venue is proper in this District under 28 U.S.C. § 1391(b). Defendant regularly conducts official business in this District. The Act will require covered members to display the Act's warning to users in this District. Defendant James resides in this District for purposes of venue because the New York Attorney General's Office maintains one of its principal offices in this District, as Defendant has recognized in other cases. *See People v. Austin*, 2021 WL 325557, at *3 (N.Y. Sup. Ct. Jan. 29, 2021) ("[T]he Attorney General's principal office is located in Manhattan."); Plaintiff's Memorandum in Opposition to Defendants' Motion to Transfer, *New York v. Amazon.com Inc.*, No. 21-cv-01417, 2021 WL 12185065 (S.D.N.Y. Mar. 10, 2021) (Defendant arguing in favor of venue in the Southern District of New York and against transfer to the Eastern

District of New York because "[t]he Southern District is the Attorney General's 'home forum,'" and "[t]herefore venue is proper in New York County because plaintiff maintains one of its principal offices in Manhattan"); Memorandum of Law in Support of Attorney General's Motion to Dismiss the Complaint or, Alternatively, to Transfer Venue at nn.10-11, *Libertarian Party of Erie Cnty. v. Cuomo*, No. 15-cv-00654, 2015 WL 7587626 (W.D.N.Y. Nov. 6, 2015) (former New York Attorney General Schneiderman arguing that "[t]he Attorney General also maintains executive offices in New York City, in the Southern District of New York. . . . [I]f the Court decides to transfer this action, transfer to the Southern District of New York also would be appropriate"). The New York Attorney General's Office maintains and accepts service of process at its "Managing Attorney's Office" located at 28 Liberty Street, 16th Floor, New York, NY 10005. *See* Serve Papers on the Office of the New York State Attorney General, N.Y. State Att'y Gen., https://perma.cc/SD4J-ESAP. And Defendant also regularly files lawsuits in this District from her office located at 28 Liberty Street, which is located within this District. *See, e.g.*, Complaint at 41, *New York v. Trump*, No. 20-cv-05770 (S.D.N.Y. July 24, 2020); Complaint at 30, *New York v. Wolf*, No. 20-cv-01127 (S.D.N.Y. Feb. 10, 2020).

## BACKGROUND

19. **NetChoice members' covered websites—like other covered social media websites—disseminate and facilitate speech that is fully protected by the First Amendment.** Covered websites allow their users to read, watch, listen, and exchange ideas on subjects "as diverse as human thought," including politics, religion, art, science, and the ordinary interactions of daily life. *Reno v. ACLU*, 521 U.S. 844, 870 (1997) (citation omitted). People use these services to "gain access to information and communicate with one another." *Packingham*, 582 U.S. at 107.

20. Covered websites operate at extraordinary scale—both individually and in combination. "[S]ocial media" services disseminate and facilitate "billions of posts" of fully protected

speech. *Moody*, 603 U.S. at 734. Users post text, images, audio, and video. And they also communicate by commenting, reacting, and responding on covered services many billions of times a day. Through these exchanges, high school students explore colleges and connect with athletic recruiters. People with rare diseases find support from others who share their experiences. And users debate philosophy, politics, and literature, exchange ideas, and build communities around shared interests and experiences.

21. **New York has multiple avenues to speak to—and attempt to persuade—its residents.** New York has many means to speak to its residents and provide its own opinions about social media use without conscripting social media services as its mouthpiece.

22. For instance, New York officials can provide public-facing information about use of the internet.

23. New York officials can engage in systematic public campaigns to ensure that their opinions reach the desired audiences, as they do on many other topics. *E.g.*, NYC Health, Youth Mental Health and Social Media Usage, https://perma.cc/J3KX-E2NY (collecting resources, including U.S. Surgeon General's social media advisory); N.Y. Dep't of Health, Public Health Toolkit – Fall 2026, https://perma.cc/SG9H-PFRG.

24. New York can also require schools and other government entities to provide digital literacy instruction about technology and social media use. *See, e.g.*, ExcelinEd, State Approaches to Digital Literacy Instruction (Feb. 2024), https://perma.cc/P5BD-8TU9; N.Y. State Educ. Dep't, Computer Science and Digital Literacy, https://perma.cc/BQ42-35JM.

25. However much NetChoice and its members may disagree with the messages that New York may wish to speak on its own behalf, NetChoice does not oppose the State's ability to engage in its own speech. *Cf. Weiser*, 808 F. Supp. 3d at 1240 ("Colorado *did* elect to educate

minors about the impacts of social media use, as shown by the [unchallenged] resource bank established by the Act.").

26. New York does not need to do any of this alone: It can partner with any number of third parties and any number of communities to spread the State's opinion.

27. New York can subsidize or amplify or endorse views it agrees with, but it cannot compel those it disagrees with to convey the State's preferred message.

28. **NetChoice members voluntarily provide extensive resources to promote digital wellbeing.** NetChoice members invest heavily in tools, information, and partnerships designed to help users make informed decisions about their online experiences.

29. Meta, which operates Facebook, Instagram, and Threads, has worked closely with experts, parents, guardians, and teens to develop Meta's Family Center, a central place for parents to oversee their teens' accounts within Meta technologies, set up and use supervision tools, and access conversation starters, tips, and research-backed guidance designed to support families' digital experience. Family Center also includes an education hub where parents and guardians can access resources from experts and review helpful articles, videos, and tips on topics like how to talk to teens about social media. Adam Mosseri, *Introducing Family Center and Parental Supervision Tools on Instagram and in VR*, Meta (Mar. 16, 2022), https://perma.cc/BF8G-HCA4. Meta also provides a Safety Center with a resource library for all users, including communities such as women, LGBTQ+, parents, teens, educators, law enforcement, journalists, activists, and public figures to discover expert-backed safety resources and tools across Meta's resources. Meta works closely with groups like ConnectSafely, the Child Mind Institute, the Digital Wellness Lab at Boston Children's Hospital, and the Trevor Project to develop resources for parents and guardians to help them have meaningful and open conversations with their teens about being online, such as

the Parents Guide. Instagram, Helping your teen navigate Instagram safely, https://perma.cc/BR79-DBM4. Meta has also built resources for teens and their parents, caregivers, and educators, working to improve digital literacy. These resources help young people navigate their time online and empower them to create the safe experiences they want. Meta, Get Digital!, https://perma.cc/A5ZT-2RLT; Meta, Youth safety, https://perma.cc/YNA7-5Q9P. And Meta's Privacy Center provides resources for all users to make privacy choices that are right for them. Meta, Privacy Center, https://perma.cc/4JJ8-4U29.

30. Pinterest is the founding signatory of the Inspired Internet Pledge, created with the Boston Children's Digital Wellness Lab, which "is a call to action for tech companies and the broader digital ecosystem to unite with the common goal of making the internet a safer and healthier place for everyone, especially young people." Pinterest, The Inspired Internet Pledge, An Industry-Wide Initiative to Create a Safer and Healthier Internet (June 20, 2023), https://perma.cc/E3US-D4YX. Pinterest's Help Center also provides resources and information to parents about their teen's use of Pinterest and social media generally. Pinterest, Help Center: Resources for Parents and Caregivers of Teens, https://perma.cc/SV35-FTCZ. Pinterest notes that "[t]hrough expert research, we've found that spending time on Pinterest improves young people's emotional wellbeing," and links to a study conducted with the University of California, Berkeley, on the power of inspirational content. *Id.*

31. In its "Mental Health and Support Resources" page, Reddit offers links to resources for users struggling with thoughts of self-harm, eating disorders, domestic abuse, sexual violence, and substance abuse. Reddit, Mental Health and Support Resources, https://tinyurl.com/trk52rky.

32. TikTok offers a variety of tools and information to help users of all ages manage their experience on the platform. It provides tools to help an individual manage their platform

experience, including the ability to set daily screen time limits and breaks and to review a screen time dashboard. Notably, while all users can set screen time limits, they are set to one hour by default for 13-17-year olds (parents can also manage their teens' screen time through Family Pairing). TikTok Support, Screen time, https://perma.cc/KHJ8-B5EQ. Among other things, TikTok offers a Time and Well-being Page, a dedicated in-app space designed to help users unwind, reset, and cultivate balanced digital habits. It offers advice on how to assess digital well-being, tips for reflecting on screentime, and resources for distressed community members. TikTok has also introduced "Well-being Missions," "a series of short, engaging missions designed to help people develop long-term balanced digital habits." TikTok, New Ways We're Helping Our Community Build Balanced Digital Habits (July 30, 2025), https://perma.cc/LW4Y-WEEL. Finally, TikTok offers a Safety Center and a Teen Safety Center that are accessible both through the app and via browser. These hubs help users with managing interactions (including setting an account to private, blocking/muting other users, and reporting accounts or content that violates TikTok's Community Guidelines). The centers also provide support resources for suicide and self-harm, substance abuse, gambling, sexual abuse, and bullying prevention. TikTok, Trust & Safety, https://perma.cc/7K5L-T6GD; TikTok, Teen Safety Center, https://perma.cc/6ZGY-XNNQ.

33. YouTube provides "tools and resources" to parents of teens "to help" parents manage teens' "experience on YouTube" and answer questions "about their teen's behavior and well-being online." YouTube Help, Tips and Resources for Parents of Teens on YouTube, https://perma.cc/MKX8-EENX. These resources include YouTube's "Family Guide to Teen Content Creation" and various Family Guides on topics from safety to wellbeing. *Id.*

34. **There are many existing options for parental control and oversight.** Parents have many existing and diverse choices to regulate and oversee whether and how their minor children use the internet.

35. There are resources that collect all these parental tools in one place. *E.g.*, Internet Matters, Parental Control Guides, https://perma.cc/VFP3-K5W7; Childnet, Home, https://perma.cc/92C4-5PM8.

36. These existing market solutions allow parents to tailor their approaches to the needs of their families.

37. Parents decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the internet.

38. Cellular and broadband internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, Verizon, Verizon Family, https://perma.cc/VTN3-S4EL; AT&T, AT&T Secure Family, https://tinyurl.com/549326b4; T-Mobile, Family Controls and Privacy, https://tinyurl.com/4ytr37hh.

39. Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and unblock websites with parental controls on Firefox, https://perma.cc/P3YJ-L8DH. Some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, Choose parental controls that are right for your family, https://perma.cc/2DVC-YDWP. Parents can also use widely available browser extensions to reinforce these tools.

40. Wireless routers often have settings allowing parents to block particular websites, filter content, monitor internet usage, and control time spent on the internet. *See, e.g.*, Netgear, Netgear Smart Parental Controls, https://perma.cc/T9KL-SQCQ.

41. Devices allow parents to limit the time their children spend on the device, block specific applications, filter content, and control privacy settings. *See* Apple, Set up parental controls to manage your child's iPhone or iPad (Oct. 26, 2026), https://perma.cc/5CEH-F9C2; Google Family Link, Help keep your family safer online, https://perma.cc/3TD8-4G2J; Microsoft, Set up Microsoft Family Safety, https://perma.cc/M3DJ-2FSC; Samsung, Manage Family groups and parental controls with your Samsung Account, https://perma.cc/4NED-X7HG; Samsung, Use Digital Wellbeing features on your Galaxy phone or tablet, https://perma.cc/MQ2L-ULLG; Android Help, Manage how you spend time on your Android phone with Digital Wellbeing, https://perma.cc/4GSD-H47U.

42. Many third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, James Capell, *Best Parental Control App of 2026: Our Security Experts and Parents Give Their Verdict*, TechRadar (Oct. 27, 2026), https://perma.cc/2BMR-DNUW.

43. **Parental tools provided by NetChoice members.** In addition, NetChoice members provide parents and minors with many tools and options to help ensure that minor children are responsibly using their services.

44. Meta places teens on Facebook, Instagram, and Threads into Teen Accounts. Teen Accounts have built-in protections that limit who can contact teens, the content they see, and the time they spend. For example, with Teen Accounts, teens are, by default, placed into: daily time limit notifications after they've spent 60 minutes on Instagram; Sleep Mode, which mutes notifications overnight and sends auto-replies if someone tries to DM them; private accounts, so people who do not follow a teen cannot see their content or tag, mention, or interact with them; blocks on search terms related to certain sensitive topics like suicide, self-harm, and eating disorders; and

more. Teens under 16 cannot change any of these default settings without a parent's permission. *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sept. 17, 2024), https://perma.cc/D3V4-GALP; Meta, We're Introducing New Built-In Restrictions for Instagram Teen Accounts, and Expanding to Facebook and Messenger (Apr. 8, 2025), https://perma.cc/M3HW-S9NW; Instagram, About Teen Accounts on Threads, https://perma.cc/8WPH-F2L3. Further, parents and guardians can use supervision tools on Facebook, Instagram, and Threads to set daily time limits for their teens or block use during select days and hours; set reminders to close the apps; change their teen's default settings to require a non-personalized feed and stop video and animation content from automatically playing without a deliberate user action; see the average amount of time their teen has spent on Facebook and Instagram over the last week (and the total time spent on Facebook and Instagram for each specific day over the last week); and more. *See, e.g.*, Meta, Support Your Teen with Supervision, https://perma.cc/H26B-RUE9.

45. Pinterest is running an experiment on reminders during the school day that remind minor users who "open[] the Pinterest app during the school day" to "put Pinterest down, pause notifications, and focus on school." Pinterest, Help Center, Resources for parents and care-givers of teens, https://perma.cc/6BZF-2DS7.

46. TikTok has a "family pairing" feature that allows parents to, among other things, set a screen time limit, filter keywords, decide whether their teen's account is private or public, turn off direct messaging, and decide who can comment on their teen's videos.

47. X defaults known minors' accounts to "protected posts." *See* X, Help Center, Information for Parents and Minor Users, https://perma.cc/4GEA-DHHM. "This means that known minors will receive a request when new people want to follow them (which they can approve or

deny), that their posts will only be visible to their followers, and that their posts will only be searchable by them and their followers (i.e. they will not appear in public searches). Furthermore, once these accounts enter a date of birth that makes them under the age of 18, they will be stopped from re-entering a new date of birth." *Id.* X excludes from its recommender system "potentially harmful content." *Id.* Further, X "prohibit[s] users from promoting or encouraging suicide or self-harm," and if someone "searches for terms associated with suicide or self harm, the top search result is a notification encouraging them to reach out for help." *Id.*

48. YouTube offers a "supervised experience" for teens, allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teen's channel activity (such as uploads, comments, and subscriptions); and (3) to choose whether to link accounts between a parent and teen. YouTube, The YouTube your kids and teens love, with the protections you want, https://perma.cc/S2KG-2W5F. YouTube has also developed features and policies directed at promoting digital wellbeing among users. *Id.* YouTube also has a "Take a Break" feature that lets a user set a reminder to take a break while watching videos. *See* YouTube Help, Take a Break Reminder, https://perma.cc/UW4J-U6F7. This feature pauses the user's video until they dismiss it or resume playing the video and is defaulted on for minors but is available for all users.

49. **Covered websites invest heavily in content moderation and beneficial user experiences.** NetChoice's members expend vast resources to improve their services and curate the third-party speech disseminated on their websites to best ensure that it is appropriate for the community of users they seek to foster. *See* Malena Dailey, By The Numbers: What Content Social Media Removes And Why 13 (2021), https://perma.cc/ZH55-XPQY. Covered services like "Facebook and YouTube" "cull and organize uploaded posts" to conform with those platforms' "content-

moderation policies," which "lead [them] to remove, disfavor, or label various posts based on their content." *Moody*, 603 U.S. at 719-20. Other NetChoice member websites enforce similar policies. They restrict the publication of harmful speech, such as violent and sexual content, bullying, harassment, and content that encourages body shaming or eating disorders. *See, e.g.*, *id.* at 735 (discussing policies about "hate speech, violent or graphic content, child safety"). In addition, many covered websites promote positive and age-appropriate speech, such as content that encourages a healthy self-image.

**NEW YORK SENATE BILL 4505 AND SENATE BILL 8827**

50. Effective January 1, 2027, the Act compels a content-based, speaker-based, and vaguely defined collection of "social media platform[s]" to convey the government's prescribed message about highly controversial purported effects of social media use on users' mental health. And regulated services must do so in the form of burdensome notifications to all users of any age, unless the user has been reasonably determined to be over the age of 17, every day they access the service, and over and over again thereafter. Those warnings last longer, become larger, and appear with greater frequency the longer a user is on the site. And no matter how many times a user has seen the warnings, the services must continue to display the warnings. And unlike warning labels on product packaging, a user cannot access any of the vast quantities of protected speech these services make available without first encountering a warning and, for the recurring warnings, sitting through it for the state-specified period of time, no matter how many times they have seen it before.

51. **Content-based, speaker-based, and vague "addictive feature platform" central coverage provisions. § 1520.** The Act targets a set of disfavored websites under its coverage provisions, which define the scope of covered websites based on their "content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

52. In general, the Act compels speech from services that enable and facilitate their users' communications and that use features common among online services.

53. The Act regulates "covered operator[s]," which are defined (pejoratively) as "any person, business, or other legal entity, and its agents and affiliates who operate or provide an addictive feature platform." § 1520(6).

54. A purportedly "addictive feature platform" is "a social media platform which offers or provides covered users an addictive feed, autoplay, and/or infinite scroll as a significant part of the services provided by such social media platform." § 1520(3).

55. In turn, a "social media platform" means:

> a public or semipublic internet-based service or application that has users in New York and that meets both of the following criteria: (a) A substantial function of the service or application is to connect users in order to allow users to interact socially with each other within the service or application. A service or application that provides email or direct messaging services shall not be considered to meet this criterion on the basis of that function alone. (b) The service or application allows users to do all of the following: (i) construct a public or semipublic profile for purposes of signing into and using the service or application; (ii) populate a list of other users with whom an individual shares a social connection within the system; and (iii) create or post content viewable or audible by other users, including, but not limited to, livestreams, on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users.

§§ 1100(5), 1520(9).

56. Underscoring the Act's focus on websites that disseminate user-generated speech, "content" means "statements or comments made by users and media that are created, posted, livestreamed, shared, or otherwise interacted with by users on an internet-based service or application. 'Content' does not include media put on a service or application exclusively for the purpose of cloud storage, transmitting files, or file collaboration." §§ 1100(2), 1520(5).

57. “Covered user” means “a user of an addictive feature platform in New York, not acting as an operator, or agent or affiliate of the operator of such addictive feature platform or any portion thereof.” § 1520(7).

58. The Act also defines what it purports to be “addictive” features:

a. “Addictive feed” means “a website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users of a website, online service, online application, or mobile application, either concurrently or sequentially, are recommended, selected, or prioritized for display to a user based, in whole or in part, on information associated with the user or the user’s device, unless any of the following conditions are met, alone or in combination with one another: (a) the recommendation, prioritization, or selection is based on information that is not persistently associated with the user or user’s device, and does not concern the user’s previous interactions with media generated or shared by other users; (b) the recommendation, prioritization, or selection is based on user-selected privacy or accessibility settings, or technical information concerning the user’s device; (c) the user expressly and unambiguously requested the specific media, media by the author, creator, or poster of media the user has subscribed to, or media shared by users to a page or group the user has subscribed to, provided that the media is not recommended, selected, or prioritized for display based, in whole or in part, on other information associated with the user or the user’s device that is not otherwise permissible under this subdivision; (d) the user expressly and unambiguously requested that specific media, media by a specified author, creator, or poster of media the user has subscribed to, or media shared by users to a page or group the user has subscribed to pursuant to paragraph (c) of this subdivision, be blocked, prioritized or deprioritized for display, provided that the media is not recommended, selected, or prioritized for display based, in whole or in part, on other information associated with the user or the user’s device that is not otherwise permissible under this subdivision; (e) the media are direct and private communications; (f) the media are recommended, selected, or prioritized only in response to a specific search inquiry by the user; (g) the media recommended, selected, or prioritized for display is exclusively next in a pre-existing sequence from the same author, creator, poster, or source; or (h) the recommendation, prioritization, or selection is necessary to comply with the provisions of this article and any regulations promulgated pursuant to this article.” §§ 1500(1), 1520(1).

b. “Autoplay” means “when content is automatically played without any manual input from a covered user.” § 1520(4).

c. “Infinite scroll” means “when a feed or landing page, whether or not such feed is addictive as defined in subdivision one of this section, automatically loads and displays additional content at the bottom or other visible end of such feed or landing page from the prospective [sic] of the user without any manual input, other than scrolling, from a user.” § 1520(8).

59. Through the statute's coverage provisions, the Act singles out a subset of the "kinds" of "social media" websites discussed by the Supreme Court in *Moody* and *Packingham*—namely, websites that enable their users to view and engage in fully protected speech. *Moody* applied full First Amendment protection to websites that work in exactly this way. 603 U.S. at 719.

60. The Act also excludes the "kinds of websites" beyond "social[ ]media" for which *Moody* questioned whether a different First Amendment editorial-discretion analysis might apply. *See id.* at 718, 724-25 (discussing email, online marketplace, peer-to-peer payment, and ride-sharing services). The Act does this through its definition of "social media platform," which explicitly excludes certain services (for example, services that provide email or direct messaging services, § 1100(5)(a)) and implicitly excludes others, such as (1) teleconferencing and video conferencing; (2) reference guides; (3) interactive and virtual gaming; (4) cloud-based services; (5) information on businesses, products, or travel; (6) business communication; (7) enterprise software; (8) streaming services; (9) educational services; (10) technical support; (11) academic research; and (12) news information.

61. Nevertheless, because the Act's coverage definition sweeps broadly to cover any operator or provider of "an addictive feature platform," § 1520, the Attorney General could conclude that services operated by NetChoice members are regulated by the Act and that those members must therefore convey the State's message.

62. **Compelled-speech warning. §§ 1521-26.** The Act, which takes effect on January 1, 2027, requires covered services to display state-authored speech in the form of a warning label each day a New York user accesses social media services (and with increasing frequency thereafter), unless the service has reasonably determined the user is over 17 years of age. These warnings must be presented as the service's own speech, because the warning is not attributed to the State.

63. Specifically, beginning on January 1, 2027, "[i]t shall be unlawful for a covered operator to provide an addictive feature to a covered user unless such operator displays a warning label in accordance with section fifteen hundred twenty-two of this article when such user accesses or uses such operator's addictive feature." § 1521. An "addictive feature" means "an addictive feed, autoplay, and/or infinite scroll." § 1520(2).

64. The Act dictates the content, the format and frequency, and the audience of the compelled warning label, and it bars users from being able to click through or bypass the warning.

65. *Content of warning.* The warning label "shall contain the following text":

> The Surgeon General has warned that while social media may have benefits for some young users, excessive use may be associated with significant mental health harms.

§ 1521.

66. This provision does not attribute the warning label to the State or explain that the website is compelled to provide it; instead, it must be presented as if it were the website's own speech.

67. NetChoice's covered members would not provide the warning required by the provision if the State did not compel them to.

68. *Format and frequency of warning.* Covered websites must comply with the Act's requirements for the format and frequency of the non-dismissible warning—with the warning becoming larger and more frequent over time:

| **Occasion** | **Minimum Duration** | **Minimum Obstruction** |
|---|---|---|
| Initial Use | 10 seconds | 25% of screen |
| After three hours of cumulative daily use, and once per hour thereafter | 30 seconds | 75% of screen |

69. The label must be displayed each day a user accesses the service when the "addictive feature" is initially provided. § 1522(1).

70. Upon this first display, the label must take up "at least twenty-five percent of the screen or window" used. § 1522(1).

71. The label must "be displayed clearly, conspicuously and continuously for at least ten seconds, without providing the ability to bypass or click through the warning." § 1522(1).

72. Then, the label must be displayed again "after three hours of cumulative active use." § 1522(2).

73. After those three hours, it must be displayed yet again "once per hour of cumulative active use." § 1522(2).

74. These subsequent warning labels "shall be displayed clearly, conspicuously and continuously for a duration of at least thirty seconds, without providing the ability to bypass or click through the warning, in a manner that occupies at least seventy-five percent of the screen the covered user is using to access the addictive feature platform." § 1522(2).

75. At no point may covered services place the label "exclusively in [their] terms of service," "obscur[e]" its "visibility or prominence," or intentionally "inhibit or subvert" the Act's purpose. § 1522(3). The Act does not define what "inhibit or subvert" means.

76. *Mandated audience for warnings.* Under the Act, websites must display their warning label to all users by default, unless they have "reasonably determined" the user to be over 17 years of age. § 1525(5).

77. *Controversiality and non-factual nature of the warnings.* The warning mandated by the State is non-factual, controversial, and does not accurately reflect the former U.S. Surgeon General's advisory.

78. The Act compels covered websites to speak the State's message on the highly controversial topic of purported effects of social media use on users. Those effects are the subject of

intense scholarly and social debate, as well as active litigation. These are contested policy and scientific judgments dressed up as factual warnings and forced into the mouths of private speakers.

79. There is not sufficient evidence of "mental health harms" from "excessive use" of "social media." § 1521.

80. For instance, a recent literature review of the National Academies of Sciences "did not support the conclusion that social media causes changes in adolescent health at the population level." Nat'l Acads. of Scis., Eng'g & Med., Social Media and Adolescent Health 94 (2024), https://tinyurl.com/3y34rs6z.

81. Numerous peer-reviewed studies conclude similarly, including a "meta-analysis of 46 studies of youth social media use and mental health" which found that "the current pool of research is unable to support claims of harmful effects for social media use on youth internalizing disorders" and recommended "caution . . . when attributing mental health harm to social media use as the current evidence cannot support this." Christopher J. Ferguson et al., *There is no evidence that time spent on social media is correlated with adolescent mental health problems: Findings from a meta-analysis*, 56 Prof. Psych.: Rsch. & Prac. 73 (Feb. 2025) (abstract), https://doi.org/10.1037/pro0000589; *see id.* at 73-83.

82. Even the threshold question of what constitutes "social media" is unsettled, and the literature on its mental health effects is sharply contested. *See, e.g.*, Christopher J. Ferguson, *Do social media experiments prove a link with mental health: A methodological and meta-analytic review*, 14 Psych. Popular Media 201 (2025), https://doi.org/10.1037/ppm0000541.

83. So, even for the handful of services that have been analyzed in the existing literature, those findings are not generally applicable across distinct online services.

84. The Act's compelled warning appears to refer to the former U.S. Surgeon General's 2023 Advisory. U.S. Surgeon Gen., Advisory: Social Media and Youth Mental Health (2023), https://perma.cc/EV2A-MMJ7 ("Advisory").

85. There is no need for covered services themselves to inform their users about the Advisory.

86. The Advisory is easily accessible online.

87. The Advisory speaks for itself.

88. The Act's one-sentence purported summation of the Advisory does not accurately, fully, completely, or uncontroversially convey the Advisory's substantive discussion or endnotes.

89. The mandated warning does not provide any context about (1) what studies the warning references; (2) the methodology or quality of the studies; (3) the population(s) of users the studies purport to describe; (4) the magnitude of the purported links the studies purportedly find; (5) the existence of contrary studies; (6) what services the studies purport to describe; (7) what "excessive" social media use entails; or (8) other critical information necessary for users to assess the content of the State's warning.

90. The sentence the Act mandates covered websites to speak does not appear in the Surgeon General's Advisory.

91. The Advisory largely focuses on "excessive *and problematic*" use—whereas the Act's compelled warning only discusses "excessive use." *Compare* Advisory at 8-10 (emphasis added), *with* § 1521.

92. The definition of "social media platform" in the Act does not correspond to the definition of "social media" employed in the Advisory—perhaps because the Advisory does *not* define the range of "social media" it purports to describe. *See* Advisory at 21 n.1 ("internet-based

channels that allow users to opportunistically interact and selectively self-present, either in real-time or asynchronously, with both broad and narrow audiences who derive value from user-generated content and the perception of interaction with others") (citation omitted).

93. The State's mandated warning also glosses over important parts of the former U.S. Surgeon General's Advisory.

94. For instance, the Advisory concluded there are "[k]nown evidence gaps" regarding social media use and mental health:

> The relationship between social media and youth mental health is complex and potentially bidirectional. . . . Most prior research to date has been correlational, focused on young adults or adults, and generated a range of results. Critical areas of research have been proposed to fill knowledge gaps and create evidence-based interventions, resources, and tools to support youth mental health. Thus, there is an urgent need for additional research.

Advisory at 11.

95. Although the Act purports to acknowledge the "benefits for some young users" of social media use, that truncated clause is drowned out by the remaining warning about all users' potential risk from "excessive" use. § 1521.

96. For instance, the former Surgeon General noted (as have many others) the potential "benefits of social media use among children and adolescents"—including facilitating (1) "positive community and connection with others who share identities, abilities, and interests"; (2) "access to important information"; (3) "a space for self-expression"; and (4) the opportunity to "form and maintain friendships online and develop social connections." Advisory at 6. "[B]uffering effects against stress that online social support from peers may provide can be especially important for youth who are often marginalized, including racial, ethnic, and sexual and gender minorities." *Id.* Those benefits exist for adult users too.

97. The Act itself recognizes that the compelled warning is not properly tailored to the circumstances of individual services. Specifically, the Act provides that the "provision of the warning label required by this article does not waive, release, otherwise limit, *or serve as a defense to*, any claim, *including claims premised on failure to warn*." § 1525(4) (emphases added).

98. **Enforcement and penalties. § 1526.** Defendant Attorney General has authority to "bring an action or special proceeding in the name and on behalf of the people of the state of New York" for alleged violations of the Act. § 1526.

99. Defendant may seek "to enjoin any violation of this article, to obtain restitution of any moneys or property obtained directly or indirectly by any such violation, to obtain disgorgement of any profits or gains obtained directly or indirectly by any such violation, to obtain damages caused directly or indirectly by any such violation, to obtain civil penalties of up to five thousand dollars per violation." § 1526.

## CLAIMS

100. For its First Amendment claims, Plaintiff raises both (1) a facial challenge to the Act; and (2) an as-applied challenge to the Act "to the extent" it regulates the NetChoice covered members and services identified in ¶ 13. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff).

101. The First Amendment facial-challenge and as-applied-challenge inquiries are straightforward "from the face of the law" here because, "to the extent [the Act] offends the First Amendment, it does so in the same material way across all social media platforms subject to the provisions of the Act." *X Corp.*, 116 F.4th at 899; *Weiser*, 808 F. Supp. 3d at 1232.

**COUNT I**
**42 U.S.C. § 1983 AND FEDERAL EQUITY**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**
**(COMPELLED SPEECH – FACIAL AND AS-APPLIED CHALLENGES)**

102. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

103. The Act's warning notification requirements, §§ 1520-26, violate the First Amendment.

104. As incorporated against the States by the Fourteenth Amendment, the First Amendment's Free Speech and Free Press Clauses provide that governments "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I.

105. The freedom of speech protected by the First Amendment "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714; *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988) (First Amendment protects against "compelled speech and compelled silence").

106. "[T]his general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995).

107. The First Amendment prohibits States from compelling private entities to adopt the State's preferred message as their own *or* to publish that message. *E.g.*, *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 12 (1986) (plurality op.) ("*PG&E*").

108. The First Amendment bars those compulsions no "matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023).

109. The Act's statutory compelled-speech requirements impose both of those burdens on the websites' freedom of speech. They compel covered websites to adopt the State's preferred message *and* to publish it to their users visiting the websites. A reasonable user would likely attribute the message to the service itself. Even if some users understand the message came from the State, the Act forces websites to convey a message they would otherwise decline to publish. *E.g.*, *PG&E*, 475 U.S. at 12 (plurality op.).

110. Much like Colorado's similar attempt to compel "social media" websites to publish warning labels, the Act's compelled-speech warning requirements trigger and fail strict First Amendment scrutiny. *E.g.*, *Weiser*, 808 F. Supp. 3d at 1234-41.

111. **The Act's compelled-speech requirements trigger strict scrutiny for two independent reasons.** The Act's compelled-speech warning notification requirements, §§ 1521-26, trigger strict scrutiny.

112. *First*, compelled-speech requirements like the Act's compelled warnings trigger strict scrutiny. *E.g.*, *Weiser*, 808 F. Supp. 3d at 1234-40.

113. "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech" and thus by default triggers strict scrutiny. *Riley*, 487 U.S. at 795; *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (citations omitted); *X Corp.*, 116 F.4th at 901-02; *Weiser*, 808 F. Supp. 3d at 1235.

114. *Second*, the Act independently triggers strict scrutiny because its speech regulation depends on a content-based and speaker-based central coverage definition for "covered operators." § 1520(6).

115. When a law's "coverage provision" "requires consideration of [websites'] content—that is, whether their content is 'predominantly or exclusively' socially interactive," that law is content based. *Murrill*, 812 F. Supp. 3d at 644-45 (citation modified).

116. The Act's central coverage definition is content based because it draws lines based on the subject of the speech on a particular website.

117. The Act distinguishes user-generated content from other kinds of content. §§ 1100(5), 1520(9).

118. The Act also distinguishes between websites that "connect users in order to allow users to interact *socially* with each other within the service or application" and websites that foster other types of interaction (*e.g.*, business or commercial). §§ 1100(5), 1520(9) (emphasis added); *see Reyes*, 748 F. Supp. 3d at 1122-23.

119. In addition, the Act triggers heightened First Amendment scrutiny because its central coverage definition is also speaker-based. The Act discriminates based on *who* is disseminating speech, advantaging websites that have made the editorial choice to disseminate content that is not user-generated, §§ 1100(5), 1520(9), while burdening similar websites that disseminate user-generated content. Because this speaker discrimination reflects a preference for content that is not user-generated, it triggers strict scrutiny.

120. Because the Act's central coverage definition is both content-based and speaker-based, the Act's operative substantive requirements compelling speech relying on this definition are also content-based and speaker-based. *E.g.*, *Murrill*, 812 F. Supp. 3d at 644-45; *Reyes*, 748 F. Supp. 3d at 1120.

121. But even if the burden is content-neutral, the Act cannot survive intermediate scrutiny because it is overbroad and the State's interest is not "unrelated to the suppression of free speech." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997).

122. **The Act does not compel or regulate commercial speech.** Because the government cannot carry its burden to demonstrate that the Act's warning label compels or regulates commercial speech, it is subject to strict scrutiny.

123. The "core notion of commercial speech is speech which does 'no more than propose a commercial transaction.'" *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010) (citation modified); *see Bonta I*, 113 F.4th at 1119.

124. The Act's compelled warnings "do not constitute commercial speech because they do far more than merely propose a commercial transaction." *Weiser*, 808 F. Supp. 3d at 1236. In fact, "the disclosures compelled by the Act require social media companies to" speak the State's preferred message about "the impacts of social media use on [users'] mental . . . health" and "such opinions . . . pertain to expressive issues of significant social, political, and scientific concern—and not matters of a commercial character." *Id.*

125. The Act's compelled warnings do not contain other "commercial . . . elements" that would justify applying the commercial-speech doctrine. *See Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 374 (2d Cir. 2025).

126. They do not constitute commercial advertisements. *Id.*

127. They do not reflect an economic motive. *Id.*; *see also Weiser*, 808 F. Supp. 3d at 1236 (compelled disclosures about the safety of social media not commercial, in part because "social media platforms would presumably have an economic incentive not to provide the disclosures as they would likely *discourage* minors from using their platforms").

128. And they do not refer to specific services. *Nat'l Inst. of Fam. & Life Advocs.*, 160 F.4th at 374. In fact, the disclosures do not concern any particular website or service at all. Instead, they require warnings about the impact of social media *generally*, without reference to the alleged impact of the regulated websites' *own* services.

129. Even if the Act's compelled warnings could be construed as commercial speech, they are "inextricably intertwined" with the websites' otherwise fully protected speech, so they are still subject to strict scrutiny. *See Riley*, 487 U.S. at 796. Covered websites disseminate "a staggering amount of" fully protected speech, *Moody*, 603 U.S. at 719, including fully protected speech on "a wide array of . . . topics as diverse as human thought," *Packingham*, 582 U.S. at 105 (citation omitted).

130. The websites' speech does not lose full First Amendment protection, or become "commercial" speech, just because the speech is offered by for-profit entities. That websites have an economic motivation for disseminating speech is "insufficient by itself" to turn the entirety of their expressive offerings into "commercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983); *see also 303 Creative*, 600 U.S. at 586.

131. Even if the compelled warnings were somehow construed as commercial speech, the State cannot force companies to engage in commercial speech if companies would not otherwise engage in commercial speech.

132. Even if the compelled warnings were somehow construed as commercial speech, the Act would still be subject to, at minimum, intermediate scrutiny, and it cannot pass muster under that standard.

133. ***Zauderer* does not apply.** If the Act compels or regulates commercial speech, at minimum intermediate scrutiny would apply, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv.*

*Comm'n*, 447 U.S. 557, 566 (1980), and not the standard of scrutiny articulated in *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626 (1985); *see Weiser*, 808 F. Supp. 3d at 1239-40.

134. *Zauderer* review is limited to efforts to "combat the problem of inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010).

135. *Zauderer* review applies only to the compelled disclosure of "purely factual and uncontroversial information about the terms under which . . . services will be available." *NIFLA*, 585 U.S. at 768 (citation omitted); *see Zauderer*, 471 U.S. at 651; *X Corp.*, 116 F.4th at 900.

136. As the Second Circuit has explained, *Zauderer* does not apply when "the disclosure . . . compels speech that goes beyond the speaker's own product or service." *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 264 (2d Cir. 2014); *see DoorDash, Inc. v. City of New York*, 185 F.4th 1, 7 (2d Cir. 2026) ("We have rejected calls to apply *Zauderer*'s deferential standard where the disclosure at issue was not about the speaker's own goods or services.").

137. The Act's compelled-speech warning requirements "in no way relate[] to the services that" regulated websites "provide," instead relying on broad statements about some amorphous collection of "social media." *NIFLA*, 585 U.S. at 768-69; *see* § 1521.

138. The compelled warnings are not purely factual and are highly controversial, because there is "robust disagreement by reputable scientific sources" and "scientific debate" on the effects of social media—not to mention ongoing litigation. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022); *see Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 245 n.6 (2d Cir. 2014); *Bonta I*, 113 F.4th at 1120 (holding that a law requiring a covered business to opine on "how its services might expose children to harmful content online" compelled "subjective opinions").

139. Moreover, the warning requirements are designed to deter use of covered websites. Although "[r]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way . . . to stigmatize and shape behavior than for the government to have to convey its views

itself, [] that makes [such a law] more constitutionally offensive, not less so." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (citation omitted).

140. Deterring users is also "controversial" because it is "fundamentally at odds with" covered websites' missions to be open and available for users to access the wide range of protected speech available on their services. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1277-78 (9th Cir. 2023) ("*NAWG*") (citation omitted).

141. The warning notifications are not factual and are controversial for another reason: The literature on the impacts of social media is nascent and constantly changing. A warning is "controversial" when "it elevates one side of a legitimately unresolved . . . debate." *Cal. Chamber of Com.*, 29 F.4th at 478 (citation omitted). The Court need not *resolve* this scientific debate; it only needs to determine that there *is* such a debate, and there is clearly one here. "[T]he truth of the statement[s]" about the impacts of social media is "subject to good-faith scientific or evidentiary dispute" and is an "integral part of a live, contentious political or moral debate" on social media use going on at all levels of policy making, cultural debates, and legal challenges throughout the country. *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281-82 (5th Cir. 2024), *aff'd as to another issue*, 606 U.S. 461 (2025).

142. Moreover, unlike, *e.g.*, government-mandated calorie counts on menus or mercury warnings on light bulbs, the Act's required warnings address *expressive content* itself rather than traditional commercial attributes of a product. The warnings do not merely inform users about objective characteristics. Instead, they comment directly on the expressive output, and label protected speech as potentially harmful for mental health. The warnings also repeatedly block access to that speech. A calorie count leaves diners free to order. The Act's subsequent warnings force users to wait before resuming access to protected expression. So, the compelled disclosures here differ from factual, product-based disclosures in both what they say and how they obstruct access to fully protected speech.

143. Even if the Act compels only "purely factual and uncontroversial" commercial speech about the websites, *Zauderer* does not apply because the Act does not advance a qualifying State interest.

144. The compelled-speech warnings do not "combat the problem of inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz*, 559 U.S. at 250; *see also Zauderer*, 471 U.S. at 650-51 (explaining that the disclosure requirement advanced "the State's interest in preventing deception of consumers" who viewed a lawyer's "advertisement").

145. Nor do the compelled-speech warnings advance even a broader interest in "better inform[ing] consumers about the products they purchase." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001). Instead, the warning expresses only a broad statement about "social media" generally, without reference to the alleged impact of the speaker's own services.

146. As explained, the compelled-speech warnings do not regulate "advertisements," *Zauderer*, 471 U.S. at 650-51, or any commercial transactions, *Sorrell*, 272 F.3d at 115.

147. And the compelled-speech warnings provide no information about the particular website. Instead, the warning expresses only a broad statement about "social media" generally, without reference to the alleged impact of the speaker's own services. § 1521.

148. **The Act's compelled-speech warning requirements fail strict scrutiny and any form of First Amendment scrutiny.** The Act cannot satisfy any form of heightened First Amendment scrutiny.

149. Under strict scrutiny, Defendant must demonstrate that the Act "is narrowly tailored to serve a compelling state interest." *Nat'l Inst. of Fam. & Life Advocs.*, 160 F.4th at 378; *see also Volokh v. James*, 148 F.4th 71, 84, 97 (2d Cir. 2025).

150. Under the First Amendment, Defendant has the burden to "specifically identify" how the Act addresses an "actual problem in need of solving" by government intervention. *Brown*

*v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (citation omitted). Here, Defendant must demonstrate that there is a problem that *requires* compelled speech—and that compelled speech is the least restrictive way to solve it.

151. Defendant cannot carry that burden.

152. New York lacks a sufficient interest in forcing covered websites to say the State's preferred message on ongoing, hotly contested, scientific and political debates about social media, especially when other means are already available to achieve the same ends.

153. New York lacks a sufficient interest in making covered websites present the State's opinion as the websites' own opinion, when the websites fundamentally disagree with the State's opinion and the State can speak for itself directly.

154. Although "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power" to dictate what "ideas" or statements private parties must provide to "children." *Brown*, 564 U.S. at 794 (citation omitted).

155. And the Act's compelled-speech requirements are not the least restrictive means that the State could have used to address any legitimate concerns it may have about social media.

156. Rather than compelling covered websites to display warning notifications, New York could engage in its own governmental speech. As other courts have already found with respect to similar laws, New York "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary content filters or application blockers, (2) educating children and parents on the importance of using such tools, and (3) relying on existing criminal laws that prohibit related unlawful conduct." *Bonta I*, 113 F.4th at 1121.

157. New York could also require schools and other government entities to provide digital literacy instruction about technology and social media use. *Cf. Weiser*, 808 F. Supp. 3d at 1240 (noting unchallenged public-education portion of Colorado law).

158. "To the extent that [users] are not aware of" this information, "notice . . . of their availability is a much less restrictive means of promoting the State's interest." *Griffin II*, 2025 WL 978607, at *14.

159. Many covered websites already include easily accessible information about safe and rewarding use of social media for users on their services and provide options for parents and their children to ensure that minors are safely and responsibly using their services. The Supreme Court has endorsed similar "voluntary" efforts over governmental mandates. *Brown*, 564 U.S. at 803. As the Court explained, "[f]illing the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Id.*

160. Furthermore, the Act's compelled-speech requirements are simultaneously "seriously underinclusive [and] seriously overinclusive. . . . And the overbreadth in achieving one goal is not cured by the underbreadth in achieving the other." *Brown*, 564 U.S. at 805.

161. The Act is underinclusive in that it does not apply to a 17-year-old staying up until 3:00 a.m. streaming shows on Hulu, but it requires warnings when that student is watching lessons for school on YouTube. Similarly, it does not apply to a high schooler spending multiple hours on a gaming website like Roblox or Minecraft, despite the ability to interact socially on those services as well.

162. In fact, the Act seems to impose warning notifications for websites that are most likely to offer parental controls and engage in content moderation, while leaving unregulated many

websites that lack such oversight. This is both underinclusive as to the unregulated websites and overinclusive as to the websites with existing parental controls and content moderation.

163. The Act is overinclusive because it requires warning notifications for large swaths of valuable, protected, and entirely innocuous speech, without purporting to identify websites that are harmful. For example, unless a covered operator has determined that such users are not minors, the Act would require warning notifications to a retiree checking neighborhood updates on Facebook, a teacher sharing lesson plans on Pinterest, and a college student watching a cooking tutorial on YouTube.

164. Research and history show that mandated disclosures are ineffective. Among other reasons, mandatory disclosures of information are ineffective because of what some scholars have called "the accumulation problem"—consumers today "confront so many disclosures daily and so many consequential disclosures yearly that they could not attend to (much less master) more than a few even if they wanted to." Omri Ben-Shahar, *More Than You Wanted to Know: Failure of Mandated Disclosure*, Harv. L. Sch. F. on Corp. Governance & Fin. Regul. (May 6, 2014), https://perma.cc/UHB3-HQ45. The Act does not explain or justify how the warning-notification requirements it imposes on covered websites will be any different.

165. Even under the lower standard of intermediate scrutiny, the Act remains unconstitutional because it does not "directly and materially advanc[e] the asserted governmental interest," and it is "more extensive than necessary to serve the interests that support it." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555-56 (2001) (citation omitted).

166. **The Act's compelled-speech warning requirements are also unconstitutional because they are unduly burdensome.** At any level of First Amendment scrutiny, the Act's compelled-speech requirements are also unconstitutional because they are "unduly burdensome."

*NIFLA*, 585 U.S. at 778. The Act's compelled warnings threaten to "drown[] out" the speech that covered websites otherwise present to users. *Id.*

167. The Act requires covered websites to repetitively display the State's mandated warnings throughout the day, at sizes ranging from 25% to 75% of the page the user sees, and for durations ranging from 10 seconds to 30 seconds. § 1522; *see Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019) (en banc) ("the contrasting rectangular border containing a warning that covers 20% of the advertisement [would] drown out Plaintiffs' messages" (citation modified)).

168. Moreover, it requires users to sit through those warnings, prohibiting services from allowing users to bypass or click through the warnings no matter how many times they have seen them. § 1522.

169. These requirements substantially interfere with covered websites' dissemination of fully protected speech on "a wide array of . . . topics as diverse as human thought." *Packingham*, 582 U.S. at 105 (citation omitted).

170. For this reason, too, the Act's requirements are unconstitutional regardless of what level of scrutiny applies. *NIFLA*, 585 U.S. at 778.

171. Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members of their fundamental First Amendment rights and will irreparably harm Plaintiff's members.

**COUNT II**
**42 U.S.C. § 1983 AND FEDERAL EQUITY**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**
**(CONTENT-BASED AND VIEWPOINT-BASED RESTRICTION ON SPEECH – FACIAL AND AS-APPLIED CHALLENGES)**

172. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

173. The Act's warning notification requirement, § 1522(3), violates the First Amendment by restricting covered websites' speech based on content and viewpoint.

174. Specifically, covered websites cannot "obscur[e]" the mandated warning label's "visibility or prominence," or intentionally "inhibit or subvert" the Act's purpose. § 1522(3).

175. For instance, displaying the website's statement that it believes the warning to inaccurately describe the particular service could be understood to "inhibit or subvert" the Act's purpose. § 1522(3).

176. If so, that would violate covered websites' "right to speak freely" based on both content and viewpoint. *Wooley*, 430 U.S. at 714.

177. The First Amendment's "most basic . . . principle[] is" that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91.

178. *Content-based restriction.* The Act prohibits speech on the "subject matter" of the State's mandated warning. *Reed*, 576 U.S. at 168.

179. *Viewpoint-based restriction.* The Act also prohibits speech expressing disagreement with the State's warning label. And "[g]overnment discrimination among viewpoints . . . is a[n] . . . egregious form of content discrimination." *Id.* (citation modified).

180. The Act's restrictions on speech would fail strict scrutiny for all the reasons explained in Count I.

181. Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members of their fundamental rights and will irreparably harm Plaintiff's members.

## COUNT III
## 42 U.S.C. § 1983 AND FEDERAL EQUITY
## VOID FOR VAGUENESS AND FACIAL OVERBREADTH UNDER THE FIRST AND FOURTEENTH AMENDMENTS
## (FACIAL CHALLENGE)

182. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

183. The Act is unconstitutionally vague and facially overbroad, both in its definition of *who* must speak the State's preferred message and what those websites must—and *cannot*—say.

184. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). This standard is stricter where First Amendment interests are at stake. *See Fox Television Stations*, 567 U.S. at 253-54. Similarly, a law is overbroad when it will "chill[] . . . constitutionally protected conduct, as prudent citizens will avoid behavior that *may* fall within the scope of a prohibition." *Farrell v. Burke*, 449 F.3d 470, 499 (2d Cir. 2006).

185. The Act's central coverage definition, § 1520, is unconstitutionally vague and facially overbroad, violating principles of due process and free speech.

186. Because the definition determines *who must speak the State's message*, its vagueness and overbreadth directly threaten and chill First Amendment rights.

187. Here, NetChoice's members will lack notice of whether they are regulated by the Act at all. *E.g.*, *Murrill*, 812 F. Supp. 3d at 659-61.

188. Although some NetChoice members may have reasonable notice of whether their services must comply with the Act, other NetChoice members have services where the Act's coverage provisions are unconstitutionally vague. *E.g.*, *id.*

189. The Act's central coverage definition fails to provide necessary notice. The Act's central coverage definition uses undefined and vague terms to determine which websites must comply with the Act's mandates.

190. For example, it is altogether opaque when an online service "offers or provides covered users an addictive feed, autoplay, and/or infinite scroll as a *significant part of* the services provided by such social media platform." § 1520(3) (emphasis added). The Act does not define "significant part" or provide any objective, measurable guideposts for making this statutory assessment.

191. In addition, it is not clear what it means to "allow users to *interact socially* with each other." §§ 1100(5), 1520(9) (emphasis added). It is difficult or impossible to isolate only the "social" aspects of human interaction, or to know where the line is between "social" and, say, "business" or "professional" interaction. Almost by definition, any medium that allows interaction of any kind allows social interaction, too. Thus, almost all websites that enable any kind of interaction among users could plausibly be covered by the Act if they meet the Act's other coverage requirements. A law that makes the exercise of First Amendment rights turn on a guess is not a law that provides fair notice.

192. Many websites will have no way of knowing what these "term[s]" mean, even though they are "critical to determining which entities fall within [the Act]'s scope." *Griffin II*, 2025 WL 978607, at *15. Therefore, "[c]ompanies must choose between risking unpredictable and arbitrary enforcement . . . and implementing the Act's . . . requirements. . . . Such ambiguity renders a law unconstitutional." *Id.* at *16; *Fox Television Stations*, 567 U.S. at 253-54.

193. The vague coverage definition is the threshold question upon which the entire Act depends: *who must speak* the State's message. Because a website cannot comply with a speech

mandate without first knowing whether it applies, the vagueness of the coverage definition renders the Act invalid in its entirety.

194. In addition, the Act's operative compelled-speech warning requirement is unconstitutionally vague and facially overbroad, violating principles of free speech.

195. The Act does not explain what it means for a covered website to "obscur[e]" the "visibility or prominence" of the label or intentionally "inhibit or subvert" the Act's purpose. § 1522(3).

196. These terms could be understood to prevent any counterspeech or additional context from the covered website.

197. Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members of their fundamental rights and will irreparably harm Plaintiff's members.

**COUNT IV**
**EQUITABLE RELIEF**

198. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

199. Sections 1520-26 violate federal law and deprive Plaintiff and its members of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong*, 575 U.S. at 326; *Ex parte Young*, 209 U.S. 123.

200. This Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing §§ 1520-26 against Plaintiff's members.

**COUNT V**
**42 U.S.C. § 1983 AND 28 U.S.C. § 2201**
**DECLARATORY RELIEF**

201. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

202. Sections 1520-26 are unlawful and unenforceable because they violate the First Amendment to the Constitution and thereby deprive Plaintiff and its covered members of enforceable rights.

203. Sections 1520-26 are also unlawful and unenforceable because they are unconstitutionally vague in violation of the First and Fourteenth Amendments to the Constitution and thereby deprive Plaintiff and its covered members of enforceable rights.

204. The unlawful portions of §§ 1520-26 are not severable from the rest of §§ 1520-26. The compelled-warning requirements constitute the entire operative purpose of §§ 1520-26; without them, nothing remains to sever. Sections 1520-26 are therefore unlawful and unenforceable.

205. With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

206. This Court can and should exercise its equitable power to enter a declaration that §§ 1520-26 are unconstitutional and otherwise unlawful.

**PRAYER FOR RELIEF**

Plaintiff requests an order and judgment:

a. declaring that New York General Business Law §§ 1520-26 are unlawful;

b. declaring that New York General Business Law §§ 1520-26 violate the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment, both facially and as applied to Plaintiff's regulated members, including those identified in ¶ 13;

c. declaring that New York General Business Law §§ 1520-26 are void for vagueness under the First Amendment and the Fourteenth Amendment to the U.S. Constitution;

d. enjoining Defendant and her agents, employees, and all persons acting under her direction or control from taking any action to enforce New York General Business Law §§ 1520-26 against Plaintiff's regulated members, including those identified in ¶ 13;

e. entering judgment in favor of Plaintiff;

f. awarding Plaintiff its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

g. awarding Plaintiff all other such relief as the Court deems proper and just.

Dated: November 13, 2026

Respectfully submitted,

/s/ Steven P. Lehotsky
Steven P. Lehotsky*
Serena M. Orloff
Jeremy Evan Maltz**
LEHOTSKY COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lehotskycohn.com
serena@lehotskycohn.com
jeremy@lehotskycohn.com

*pro hac vice pending
** pro hac vice forthcoming

*Attorneys for Plaintiff NetChoice*